1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10 **TERESITA TOMADA**, *et al.*                 Case No.: 13-CV-1647 YGR

**Plaintiffs**,                                **ORDER GRANTING MOTION FOR SUMMARY**
11                                              **JUDGMENT**

        **v.**
12

13 **HOME DEPOT U.S.A., INC.**,

**Defendant.**
14

15 **I.      INTRODUCTION**

16          At the beginning of every month, defendant Home Depot U.S.A., Inc. ("Home Depot")

17 requires its employees to watch an online employee training video and then complete a short quiz.

18 In 2012, Home Depot terminated the employment of plaintiffs Teresita Tomada, Wilhelmina de

19 Leon, and Gloria Santiago, who then worked in cashier positions at a Home Depot Pro store in

20 Colma, California.  The terminations followed plaintiffs' admissions that other employees had taken

21 the quizzes for them.  Home Depot also terminated the persons who admitted to taking quizzes on

22 another's behalf.  Plaintiffs are Filipina and, at the time of their termination, each was in her sixties

23 and had been employed by Home Depot for at least seven years.  Plaintiffs' theory of suit, in

24 essence, is that Home Depot's termination of their employment (1) discriminated against them on

25 the bases of age, national origin, and race, and (2) breached their alleged implied-in-fact

26 employment contract, which, plaintiffs argue, required good cause for any termination.  In a

27 complaint filed in state court and removed to this federal court, each plaintiff asserts the following

28 eight claims:

1.  Age discrimination in employment under California's Fair Employment and Housing Act, CAL. GOV'T CODE § 12940 *et seq.* ("FEHA");

2.  National origin discrimination in employment under FEHA;

3.  Race discrimination in employment under FEHA;

4.  Wrongful discrimination and termination in violation of public policy, based on age and under FEHA;

5.  Wrongful discrimination and termination in violation of public policy, based on national origin and under FEHA;

6.  Wrongful discrimination and termination in violation of public policy, based on race and under FEHA;

7.  Breach of contract; and

8.  Breach of the implied covenant of good faith and fair dealing.

(Dkt. No. 1.)

Now before the Court is Home Depot's motion for summary judgment as to all eight claims. (Dkt. No. 36 ("Motion").)  The Motion is fully briefed.   (Dkt. Nos. 50 ("Opp'n"), 59 ("Reply").) Having considered the parties' papers and arguments, and the admissible evidence, and having had the benefit of oral argument on April 29, 2014, the Court **GRANTS** Home Depot's Motion.  As to plaintiffs' discrimination claims, assuming that plaintiffs can make the required prima facie showing of race, national origin, and age discrimination, Home Depot has articulated a legitimate, non-discriminatory reason for terminating plaintiffs—their admitted violations of Home Depot's Code of Conduct—and plaintiffs have adduced neither direct nor circumstantial evidence of pretext sufficient to raise a triable issue of material fact.  As to plaintiffs' contract claims, the evidence establishes that, even assuming plaintiffs had a for-cause employment contract with Home Depot, plaintiffs' Code of Conduct violations supplied Home Depot with good cause for terminating their employment.

## II.     BACKGROUND

The facts detailed herein are undisputed unless otherwise noted.  Because of the number of people involved in the events underlying this case, the Court begins by briefly introducing the key

United States District Court
Northern District of California

2

players.  The Court then recounts the facts of the case, drawn from the evidence viewed in the light most favorable to plaintiffs.

### A.    PERSONS INVOLVED

During the relevant period, plaintiffs Tomada and Santiago worked at Home Depot's Colma Pro store as head cashiers, sometimes referred to as line managers, and de Leon worked at the same store as a cashier.  Tomada was 61 years old and had worked for Home Depot for seven years; Santiago was 68 and had worked there for eighteen years; and de Leon was 66 and had worked there for seven years.  All three plaintiffs articulate their protected classes as Asian (race), Filipino (national origin), and over 40 (age).

The manager of the Colma Pro store was Jeff Coite, a white man in his late forties whom, as discussed in further detail below, plaintiffs assert to be the root of the discriminatory animus that allegedly led to their termination.  Coite conducted the initial investigation into alleged quiz-taking conduct and ultimately terminated plaintiffs.  Two assistant store managers also figure prominently.  The first is David Duran, a person of mixed Middle Eastern and Hispanic heritage in his early thirties.  The second is Chris Worth, a white person in his late forties.  Worth is the person who first received word from a store associate that employees were taking each other's quizzes.

In addition to the management of the Colma Pro store, several associates play a role in the telling of this case.  Giulio Di Francia, a white person in his mid-twenties, and a cashier, was the person who reported to Worth that employees were taking each other's quizzes.  He later admitted to having taken a quiz for plaintiff Tomada and Home Depot ultimately terminated him.  Rosemarie Exconde (Filipina, mid-fifties) worked as a cashier, admitted to taking a quiz for plaintiff Santiago, and ultimately was terminated by Home Depot.  Angela Leung (mixed Spanish and Chinese heritage, mid-twenties) worked as a cashier, admitted to taking a quiz for plaintiff de Leon and ultimately was terminated by Home Depot.  Brendan Herger (white, mid-twenties) worked as a cashier, and, though implicated by plaintiffs in the quiz-taking conduct, denied any involvement.  Home Depot did not terminate Herger.

The record reflects that Home Depot follows the common practice of organizing its stores into districts and its districts into regions.  (*See* Villanueva Decl., Ex. 20 at 18:14-19:6, Ex. 21.)  At

United States District Court
Northern District of California

the district level, human resource manager Carrie Fitzpatrick (white, late-thirties) opined on the notion of terminating plaintiffs, stating that "serious noise" might ensue from firing them as "long term employees."  At the regional level, Dana Woodard, an associate relations manager, also consulted regarding the termination proposal.

Home Depot maintains, at its corporate headquarters in Atlanta, a team referred to as the Associate Advice and Counsel Group ("AACG").  One member of the AACG was Lynette McLeod (white, fifties), who conducted the AACG's initial investigation into the quiz-taking conduct after store manager Coite initially recommended terminating plaintiffs.  Another is Pamela Castillo (white, fifties), who was involved in discussions of the appropriate response to the quiz-taking conduct at the Colma Pro store.  McLeod's manager in the AACG was Joyce Riggs, an African-American.  Riggs gave McLeod direction about how to correct deficiencies in her original investigation, and ultimately communicated the AACG's recommendation of termination to Coite.

### B.   STATEMENT OF FACTS

On September 11, 2012, Home Depot terminated plaintiffs and three other associates also implicated in the quiz-taking conduct.  Two shared with plaintiffs some protected characteristics and one did not: Angela Leung is of mixed Spanish and Chinese descent and was in her late twenties (Dkt. No. 36-6 ("Cartwright Decl."), Ex. 28 at 14:8-11); Rosemarie Exconde is Filipina and was in her mid-fifties; and Giulio Di Francia is white and was in his mid-twenties.[1]

During the relevant time period, Home Depot maintained a Code of Conduct which prohibited its associates from, among other things, allowing other associates to access confidential associate information.  (Dkt. No. 36-2 ("Coite Decl."), Ex. 2 ("Code of Conduct") at HD000362-63.)  The Code of Conduct is distributed to employees during their initial orientation after hiring.

---

[1] The parties have cited no evidence of the age or heritage of Exconde, nor has the Court found any.  Plaintiffs represent her age and heritage on page 6 of their Opposition, without citation to evidence.  Plaintiffs also represent the age and heritage of Di Francia in their Opposition.  Responding to one of Home Depot's requests for admission ("RFA"), plaintiffs admitted that Di Francia was under age 40 but denied that he was not Filipino, with plaintiffs' counsel writing "I believe he is part Filipino."  (Cartwright Decl., Ex. 37, RFA 21.)  Plaintiffs have apparently abandoned that belief.  (*See* Opp'n at 6 (describing Di Francia as "White").)  For purposes of the instant motion, the Court assumes the truth of plaintiffs' unchallenged representations as to Exconde and Di Francia's age and heritage.

United States District Court
Northern District of California

1   (Dkt. No. 36-3 ("Fitzpatrick Decl.") ¶ 14.)  Home Depot also required its employees to watch, at

2   the beginning of each month, an employee training video called "InFocus" and then take a quiz

3   covering the information in the video.  (Fitzpatrick Decl. ¶ 7; Cartwright Decl., Ex. 16 at 30:20-

4   31:3; Dkt. No. 36-5 ("Riggs Decl.") ¶ 9; *see also* Coite. Decl. ¶¶ 10, 11, Ex. 1 (screenshots of

5   InFocus quiz).)  Employees accessed both the videos and quizzes through the company's private

6   intranet, in an online application called "myApron."  (Fitzpatrick Decl. ¶ 8; Coite Decl. ¶ 11.)  An

7   employee would log in to myApron using a personalized user name and password and, from there,

8   navigate to the InFocus video and quiz.  (*Id.*)  While logged in to myApron, it is possible to access

9   other information besides InFocus, including information confidential to the logged-in employee.

10   (Cartwright Decl., Ex. 30 at 110:22-112:25; Riggs Decl. ¶ 11.)

11          On August 1, 2012, Tomada was working in the Colma store.  Pursuant to her duties as line

12   manager, Tomada was called away to assist another employee and asked a nearby cashier, Di

13   Francia, to complete her InFocus quiz for her.  Di Francia agreed, Tomada left, and Di Francia took

14   the quiz.  (Cartwright Decl., Ex. 10 at 39:2-25.)

15          Later, Tomada asked Di Francia to go to the tool rental department and assist associates

16   there.  Di Francia refused, and Tomada told him she would report him to store management.  She

17   apparently did so.  (Cartwright Decl., Ex. 10 at 41:25-42:19, Ex. 16 at 50:14-17, Ex. 20 at 37:10-

18   38:9.)  Assistant store manager Chris Worth went to talk to Di Francia about Tomada's report and

19   Di Francia complained that employees in the "front end"[2] were doing each other's InFocus quizzes.

20   (*Id.*, Ex. 20 at 37:10-38:9, Ex. 21.)

21          Worth told store manager Jeff Coite that he had heard of employees completing each other's

22   InFocus quizzes.  (*Id.*)  Coite is white, U.S.-born, and, during the relevant period, was in his late

23   40s.  (*See* Dkt. No. 41 ("Villanueva Decl."), Ex. 24 at 5:14-22.)  After speaking to Worth, Coite

24   began to investigate by interviewing Di Francia and another associate who witnessed the

25   conversation between Di Francia and Worth, and then interviewing the three plaintiffs and

26

27          [2] "Front end," in this context, refers to a category of Home Depot associates including
    cashiers and head cashiers.  (*See, e.g.*, Cartwright Decl., Ex. 5 at 119:11-14; Ex. 21.)  It appears to
28   be a metonymy for the area of the store where such associates work, i.e., at the "front" end of the
    store, where customers enter and exit.

United States District Court
Northern District of California

1   Exconde.  Coite determined that the three plaintiffs, Di Francia, and Exconde had all been either

2   taking quizzes for someone else or asking someone else to take theirs.  At Coite's behest, all five

3   wrote statements.  In the statements, all five, including plaintiffs, admitted to participating in the

4   conduct.  Specifically, Tomada admitted to having Di Francia take her quiz;[3] Santiago admitted to

5   having Exconde take hers; and de Leon admitted to having two other associates, Leung and Herger,

6   take hers.  (Cartwright Decl., Exs. 3 (de Leon statement), 7 (Santiago statement), 11 (Tomada

7   statement),  17 (Exconde statement), 19 (Di Francia statement).)  Coite believed Herger to be white

8   and in his mid-twenties.  (Villanueva Decl., Ex. 24 at 66:4-12.)  Santiago wrote:

9              I know that other associates has [sic] done it but I did not know that
10             this is against SOP [apparently, "standard operating procedure"].  I
               thought I was just helping out and they were helping me.  If I would
11             have known this is against SOP I would not ever done it.  I was never
               told it[']s against SOP policy and also because I've seen others doing
12             it I thought it was alright[.]

13   (Cartwright Decl., Ex. 7 at HD000347-48.)

14         Coite discussed the situation with the human resources manager for his store's district,

15   Carrie Fitzpatrick.  Fitzpatrick is white, from the U.S., and was in her late thirties.  (Villanueva

16   Decl., Ex. 20 at 5:14-6:2.)  On or about August 9, 2012, Coite escalated the investigation to

17   Lynnette McLeod, an Atlanta-based corporate-level manager in the AACG.   McLeod created a

18   "ticket," or case, to track the investigation.  McLeod interviewed the three plaintiffs by telephone,

19   as well as Exconde and Di Francia.  McLeod did not at that time interview Leung or Herger,

20   notwithstanding their having been named in de Leon's statement.  (*See* Cartwright Decl., Ex. 23 at

21   29:12-18 (McLeod deposition testimony acknowledging that she did not interview Leung or Herger

22   before September 1, 2012, though eventually she did interview them); *see also id.* at 30:4-11

23   (McLeod testifying that she missed Leung and Herger's names in de Leon's statement).)

24   Ultimately, McLeod concluded that the appropriate action was terminating the three plaintiffs and

25   giving Exconde and Di Francia "final counseling," which, in Home Depot's system of progressive

26   discipline, is the step just before dismissal.  (*Id.*, Ex. 22 at 78:3-21; *id.*, Ex. 23 at 11:2-10.)  McLeod

27   _____

28         [3] Tomada also named another person, a third party named "Millie" whose conduct is not at
     issue here.  (Cartwright Decl., Ex. 11.)

                                          6

did not know plaintiffs' age, race, or national origin when she was conducting her investigation. (Dkt. No. 40 at 5-6, Fact 19.)

On August 15, 2012, McLeod wrote to Coite, stating she had had the chance to review the statements, that Coite had indicated he was "considering termination and final [counseling] for the associates involved," that she was scheduling interviews, and that she was required to conduct interviews before giving "termination and final recommendations."  (Villanueva Decl., Ex. 9 at HD000926; *see also id.*, Ex. 8 at 14:9-15:1.)

On August 20 and 21, McLeod interviewed the three plaintiffs, as well as Exconde and Di Francia, by telephone.  (*See* Villanueva Decl., Ex. 3, at 29:22-23; *id.*, Exs. 6, 9.)

On August 21, McLeod sent Coite her recommendation regarding the plaintiffs, Di Francia, and Exconde.  (Villanueva Decl., Ex. 23 at HD000933-34.)  She recommended terminating plaintiffs, who, she noted, had "asked other associates to complete their quizzes for them," and recommended giving final counseling to Di Francia and Exconde, who "took the quizzes."  (*Id.*) She characterized the associates' acts as a "major violation of the COC – Integrity Policy" in that they had "falisf[ied] a company document or a document relied upon by the company," and represented that she had interviewed "all involved associates."  (*Id.*)  In fact, she had not interviewed Leung or Herger.

On August 22, Fitzpatrick, the district human resources manager, emailed two regional human resources managers:

> Fyi these 3 associates are long term people who are being terminated out of colma pro.  There may be some serious noise around this series of terminations . . . please advi[s]e if you want me to do anything proactive.

(Villanueva Decl., Ex. 23, at HD000933.)

In the course of the next day, Fitzpatrick's email was forwarded to Pamela Castillo in Atlanta.  (*See* Villanueva Decl., Ex. 18.)  Castillo emailed senior AACG manager Riggs, stating the results of her review of the case, which included one associate's statement that the quiz-taking conducted was "not limited to the front end" but also involved "service desk associates"; her finding that service desk associates had not been interviewed; and her impression that the

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1  recommendation to terminate plaintiffs and give final warnings to Di Francia and Exconde

2  "[s]eem[ed] harsh for the infraction."  (*Id.*, at HD001015-16.)  On August 23, after receiving

3  Castillo's email, Riggs sent Castillo, regional human resources manager Dana Woodard, and others

4  an email response commenting that the investigation did not "sound like it [was] completed" and

5  recommending "hold[ing] off on delivering discipline until the investigation [had] been thoroughly

6  reviewed by" a team lead or senior manager.  (*Id.* at HD001015.)

7         Riggs later reviewed the ticket herself.  (Villanueva Decl., Ex. 11.)  Following her review,

8  on September 1, she emailed McLeod, stating that "[t]he field and I have gone back and forth and

9  finally settled on termination for all the associates involved."  (*Id.*)  The "field" referred to

10  Woodard.  (*Id.*, Ex. 13, at 101:5-14.)  Riggs also directed McLeod to interview two associates,

11  Leung and Herger, who had been implicated but not interviewed as part of McLeod's initial

12  investigation.  (*Id.*, Ex. 11, at HD001003-04.)

13         During those interviews, Leung admitted to completing an InFocus quiz for de Leon.

14  (Cartwright Decl., Ex. 27, at HD000884.)  Leung also wrote a statement concerning what she said

15  in the interview, stating that she had helped both de Leon and Santiago with their quizzes. (*Id.*, Ex.

16  29, at HD000860.)  Following McLeod's interview with Herger, Herger wrote a statement in which

17  he denied ever hearing of another associate taking a quiz for another associate and ever having been

18  asked to do so personally.  (*Id.*, Ex. 25, at HD000861.)  McLeod recommended to Riggs that

19  termination was warranted for Leung, because she had admitted to the misconduct, but that,

20  because Herger had denied misconduct and there were no witnesses corroborating de Leon's

21  implication of Herger, the allegations against Herger were unsubstantiated and that discipline

22  therefore was not warranted.  (Villanueva Decl., Ex. 15; Cartwright Decl., Ex. 23 at 37:1-16.)

23         After McLeod reported on the two interviews, Riggs evaluated the ticket and determined

24  that termination was appropriate for all three plaintiffs, along with Exconde, Di Francia, and Leung.

25  Riggs testified to having done so on the basis of falsification of company records (the quiz itself,

26  plus a report run by Home Depot to determine who has taken the quiz), as well as giving another

27  associate access to confidential associate information by failing to log out of myApron so that

28  another associate could access and take the InFocus quiz.  (*See* Cartwright Decl., Ex. 30 at 104:8-

1  114:22.)  Riggs communicated her recommendation to Coite in an email dated September 10, 2012.

2  (Villanueva Decl., Ex. 16.)

3  Coite prepared final "Performance/Discipline Notices" outlining the reasons for terminating

4  the associates.  Each plaintiff's final notice of termination stated, in substantially identical terms,

5  that the plaintiff had "intentionally allowed another associate to utilize her employment user ID,

6  launch the In-Focus [sic] application, and complete the monthly quiz on her behalf. . . .  As noted

7  above, these actions are a major violation of the Associate Code of Conduct in falsifying company

8  documents."  (Cartwright Decl., Exs. 4 (de Leon), 9 (Santiago), and 12 (Tomada).)  Above that

9  language, in a section titled "Reason for Discussion," the Performance/Discipline Notice said:

10  
> Falsifying a Company document or a document relied upon by the
> Company by including false information or by knowingly omitting
> relevant information.  *The following are examples*:

11  
> - Falsifying reports, medical excuses, applications, etc.
> - Using another cashier's log-in number
> - Improperly using an associate's Social Security number or
>   employment ID

12

13

14  (*Id.* (emphasis supplied).)

15  Each Performance/Discipline Notice stated, under a section reserved for stating "the

16  improvement & action plan to address the issue": "Due to the severity of the infraction against the

17  Code of Conduct, [plaintiff's] at-will employment with The Home Depot is hereby terminated

18  effective today."  (*Id.*)  The Performance/Discipline Notices are signed by each respective plaintiff

19  and Coite, and dated September 11, 2012.  (*Id.*)

20  ## III.    APPLICABLE LEGAL STANDARD

21  Summary judgment is appropriate when there is no genuine dispute as to any material fact

22  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party

23  seeking summary judgment bears the initial burden of informing the court of the basis for its

24  motion, and of identifying those portions of the pleadings, depositions, discovery responses, and

25  affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*,

26  477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.

27  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of *some* alleged

28  factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id.* (quoting *Anderson*, 477 U.S. at 250). The opposing party's evidence must be "significantly probative," not "merely colorable." *Anderson*, 477 U.S. at 249-50. Further, that party may not rest upon mere allegation, speculation, or denial of the adverse party's evidence, but must produce admissible evidence showing there is a genuine issue of material fact for trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, a court is not obligated to review the entire record in order to identify a triable issue of material fact on the non-moving party's behalf. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(3). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279.

## IV.    DISCUSSION

### A.    EVIDENTIARY OBJECTIONS AND OTHER PRELIMINARY MATTERS

Both sides raise a variety of objections to evidence and discovery conduct by the other side. Home Depot, additionally, objects to various documents filed by plaintiffs which exceed page limits established by the Court's Civil Local Rules and seeks the sanction of having those

documents struck either in their entirety or to the extent they exceed the applicable page limits.[4] The Court **OVERRULES** Home Depot's objections.  The Court has considered all of the argument submitted by plaintiffs and, to the extent admissible, their cited evidence.

The Court also **OVERRULES** plaintiffs' objections.  To the extent that plaintiffs object to the declarations of store manager Coite and district human resource manager Fitzpatrick, the objections are untimely because both declarations were filed with Home Depot's Motion and plaintiffs objected following the close of briefing.  *See* Civ. L.R. 7-3(d)(1).  To the extent that plaintiffs object to the Coite Declaration on the grounds that it contradicts his deposition testimony, the objection is overruled because the evidence to which plaintiffs object goes to the issue of whether Coite made promises giving rise to an implied-in-fact for-cause employment contract and, as the Court explains in Section IV.C *infra*, it is not necessary to decide that issue in order to resolve this motion.  To the extent that plaintiffs seek evidentiary sanctions under Federal Rule of Civil Procedure 37 on the basis of Home Depot's alleged discovery misconduct, the request is denied because (1) plaintiffs failed to notice a proper motion, *see* Civ. L.R. 37-4, and (2) plaintiffs never raised the issue of Home Depot's purported misconduct during the discovery period, despite having had sufficient time to do so.

### B.   PLAINTIFFS' DISCRIMINATION CLAIMS

Plaintiffs bring six discrimination-based claims, specifically, claims under FEHA for employment discrimination on the basis of (1) age, (2) national origin, and (3) race, and claims for wrongful discrimination and termination in violation of public policy based on (4) age, (5) national origin, and (6) race.  The latter claims depend wholly on the former, in that the only public policy allegedly violated is FEHA.  (*See* Compl. ¶¶ 46, 49, 52.)  The Court therefore focuses solely on the FEHA claims.

---

[4] Plaintiffs submitted two overlong documents. First, plaintiffs' Opposition is overlong. (*Compare* Opp'n (27 pages long) *with* Civ. L.R. 7-3(a), 7-4(b) (allowing opposition brief of no more than 25 pages unless otherwise permitted by the Court).)  Second, plaintiffs' responsive statement of facts (Dkt. No. 40) exceeds by one page the page limits set by the undersigned judge's Standing Order in Civil Cases.  The Court does not take lightly any party's violation of a duly promulgated page limit and, indeed, routinely strikes excess pages.  In the circumstances now at bar, however, the Court exercises its discretion to decline to impose a sanction.

United States District Court
Northern District of California

### 1.    Legal Standard Applicable to Employment Discrimination Claims

Under FEHA, it is an unlawful employment practice for an "employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age or sexual orientation of any person to . . . discriminate against the person in compensation or in terms, conditions or privileges of employment." CAL. GOV'T CODE § 12940(a).  Because of the similarity between California and federal employment discrimination laws, courts deciding FEHA claims look to federal employment discrimination law.  *See Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000).

In a disparate treatment case such as the one at bar, the plaintiff must show that intentional discrimination was the determinative factor in the adverse employment action.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).  "The evidence proffered can be circumstantial or direct." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998)).  Direct evidence is evidence that proves the fact of discriminatory animus without inference or presumption.  *Godwin*, 150 F.3d at 1221.  "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.*

Where a plaintiff relies on circumstantial evidence, courts often apply the evidentiary framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, the plaintiff bears an initial burden to produce evidence supporting a prima facie case of discrimination.  He or she may do so by showing that : (1) the plaintiff belongs to a protected class, (2) the plaintiff was performing his or her job satisfactorily; (3) the plaintiff was subjected to an adverse employment action; and (4) similarly situated individuals outside of the plaintiff's protected class were treated more favorably.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).

If the plaintiff establishes a prima facie case of discrimination, a presumption of discrimination arises and the burden shifts to the employer, who must present evidence sufficient to permit the factfinder to conclude that the employer had a legitimate, nondiscriminatory reason for

1    the adverse employment action.  *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07; *Reeves v.*

2    *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

3         If the employer does so, "the *McDonnell Douglas* presumption of discrimination drops out

4    of the picture." *McGinest*, 360 F.3d at 1123 (internal quotation marks omitted).  The plaintiff must

5    demonstrate that the employer's articulated reason is a pretext for unlawful discrimination, either

6    directly, by persuading the court that a discriminatory reason more likely motivated the employer,

7    or indirectly, by showing that the employer's proffered reason is unworthy of credence.  *Tex. Dep't*

8    *of Comty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Aragon v. Republic Silver State*

9    *Disposal Inc.*, 292 F.3d 654, 658-59 (9th Cir. 2002) (en banc ).  To establish pretext, very little

10   direct evidence of discriminatory motive is required, but, if circumstantial evidence is offered, such

11   evidence has to be "specific" and "substantial."  *Godwin*, 150 F.3d at 1222; *Cornwell v. Electra*

12   *Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (merely denying the credibility of

13   defendant's proffered reason for the challenged employment action or relying solely plaintiff's

14   subjective beliefs that the action was unnecessary are insufficient to show pretext); *Wallis v. J.R.*

15   *Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (plaintiffs cannot show pretext and thus avoid

16   summary judgment "simply by making out a prima facie case" or "denying the credibility" of

17   defense witnesses).

18        "Although intermediate evidentiary burdens shift back and forth under this framework,

19   '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

20   against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 143 (quoting

21   *Burdine*, 450 U.S. at 253 (alteration in original)); *see also Guz*, 24 Cal. 4th at 356.  Thus, "if the

22   employer presents admissible evidence either that one or more of plaintiff's prima facie elements is

23   lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors,

24   the employer will be entitled to summary judgment unless the plaintiff produces admissible

25   evidence which raises a triable issue of fact material to the defendant's showing." *Caldwell v.*

26   *Paramount Unified Sch. Dist.*, 41 Cal. App. 4th 189, 203 (Cal. Ct. App. 1995) (citing *Burdine*, 450

27   U.S. at 255 n.8).

28   ///

1

2.     **Plaintiffs' Proffer of Direct Evidence**

2

Plaintiffs proffer two "facts" which, they contend, are direct evidence of discrimination.

3

(Opp'n at 17-18.)  Neither is—the first because it is not direct and the second because it is not

4

evidence.

5

Plaintiffs' first proffer of purportedly direct evidence is the August 22, 2012 email sent by

6

district human resources manager Carrie Fitzpatrick, opining that terminating plaintiffs, as "long-

7

term employees," might create some "serious noise."  (Villanueva Decl., Ex. 23.)  Plaintiffs point to

8

this email as direct evidence that Home Depot "changed its decision to cover up its true

9

discriminatory motives." (Opp'n at 17.)  Plaintiffs do not explain why they regard this evidence as

10

direct evidence of discrimination.  It is not.  "Direct evidence is evidence which, if believed, proves

11

the fact of discriminatory animus without inference or presumption."  *Godwin*, 150 F.3d at 1221

12

(internal quotation marks and brackets omitted).  Plaintiffs' proffered evidence depends on *multiple*

13

inferences and presumptions.  For example, plaintiffs infer from Fitzpatrick's observation that a

14

cover-up is in the works.  Plaintiffs also presume that Fitzpatrick's use of the phrase "serious noise"

15

refers to something other than the sort of surprise or disruption that may occur among employees

16

when a long-term colleague is fired.  Fitzpatrick's statement is, at most, circumstantial evidence of

17

discrimination.[5]  At oral argument, plaintiffs' counsel confirmed this conclusion by characterizing

18

Fitzpatrick's use of the term "long term employees" as a signal that plaintiffs were "old."  Such

19

characterization necessarily requires an inferential leap, as an employee may be long-term in the

20

sense used by Fitzpatrick—de Leon and Tomada had worked at Home Depot for seven years and

21

Santiago for eighteen—and still fall outside plaintiffs' protected age category.  Fitzpatrick's email is

22

not direct evidence of discrimination.

23

Plaintiffs' second purported piece of direct evidence of discrimination is a statement by

24

assistant store manager Duran that "he wanted to get rid of the Filipino employees."  (Opp'n at 18

25

(citing Villanueva Decl., Ex. 2, at 22:23-24:12).)  Were this admissible evidence, it would indeed

26

27

28

[5] Fitzpatrick testified that, by "noise" she meant "[p]eople being upset."  (Dkt. No. 59-1, Ex. 40, at 75:12-13; *see also id.* at 73:16-74:2 (Fitzpatrick testifying that her feeling about the email was that "a lot of people . . . would be upset because [plaintiffs] were long-term employees and there wasn't a lot of turnover in [the Colma Pro] store").)

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    be direct evidence of discriminatory intent on Duran's part.  However, it is not admissible.  The

2    evidence consists of plaintiff Tomada's deposition testimony that one of her associates overheard

3    Duran make the alleged statement at a bar; the eavesdropper then related the statement to a co-

4    worker while they were "gossip[ing]"; the gossip, in turn, related it to plaintiff de Leon, who then

5    related it to Tomada.  (Villanueva Decl., Ex. 2, at 22:23-24:12.)  The proffered evidence is

6    obviously inadmissible hearsay—triple-hearsay, in fact.[6]  *Cf. Godwin*, 150 F.3d at 1221 (rejecting

7    argument that out-of-court statement directly suggestive of bias was inadmissible hearsay because

8    it may have been made in the scope of employment by person directly involved in making adverse

9    employment decision).  Further, even if the purported statement were not inadmissible hearsay,

10   plaintiffs would have to establish a nexus between Duran's discriminatory remarks and the

11   subsequent employment decisions made by others.  *See Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640

12   (9th Cir. 2003).  Plaintiffs neither address that connection nor cite record evidence suggesting that

13   Duran had any involvement in the decision to terminate plaintiffs.  Duran's purported statement is

14   not admissible evidence of discrimination.

15                   **3.    Plaintiffs' Prima Facie Case**

16          In the absence of direct evidence, the Court turns to plaintiffs' circumstantial evidence

17   (including the Fitzpatrick email) and the familiar *McDonnell Douglas* analysis.  Plaintiffs here seek

18   to establish a prima facie case of discrimination on three separate bases: race, national origin, and

19   age.  Establishing a prima facie case of discrimination requires evidence: (1) that plaintiffs belong

20   to a protected class, (2) that plaintiffs were performing their jobs satisfactorily; (3) that plaintiffs

21   were subjected to an adverse employment action; and (4) some other circumstance giving rise to an

22   inference of discrimination.  *Bodett*, 366 F.3d at 744; *Guz*, 24 Cal. 4th at 355; *Peterson v. Hewlett-*

23   *Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).  This fourth prong may be satisfied by showing

24   that similarly situated persons outside plaintiff's protected class received more favorable treatment

25   than plaintiff.  *Peterson*, 358 F.3d at 603.

26

27          [6] At oral argument, plaintiffs' counsel characterized Duran's statement as a party admission.

28   *See* Fed. R. Evid. 801(d)(2).  Assuming that exception to the hearsay rule applied, it would apply
     only to Duran's statement.  Plaintiffs proffer no cure for the second and third levels of hearsay.

1    Home Depot challenges only the second and fourth prongs of plaintiffs' prima facie case.

2    (Reply at 2.)  That is, Home Depot acknowledges that each plaintiff belongs to the protected classes

3    asserted (Asian, Filipina, and over 40) and that each plaintiff suffered termination, but disputes that

4    plaintiffs were performing satisfactorily in their jobs or that similarly situated employees were

5    treated differently, that plaintiffs' jobs were given to much younger employees, or that other

6    circumstances giving rise to an inference of discrimination exist.  The Court addresses the

7    challenged prongs in turn.

8                    a.       *Second Prong: Satisfactory Performance*

9            Neither party disputes that the three plaintiffs were long-term employees whose

10   employment records, aside from the conduct at issue here, generally reflect good performance.  The

11   record evidence supports that conclusion.  (*E.g.*, Villanueva Decl., Ex. 24, at 25:17-26:1 (store

12   manager Coite answering "Yes" when asked if each of the three plaintiffs was performing

13   satisfactorily at the time of her termination).)  Home Depot, however, contends that plaintiffs were

14   *not* performing satisfactorily at the time of their termination because they admittedly falsified their

15   InFocus quizzes.  (Mot. at 15-16.)  Plaintiffs respond that the Court must examine the matter of

16   satisfactory performance without reference to the conduct that purportedly gave rise to the

17   termination.   (Opp'n at 18-21.)

18           This dispute raises the question of what the applicable standard for examining satisfactory

19   workplace performance in the context of a prima facie discrimination claim is.  The parties do not

20   expressly acknowledge that question.  Neither do they present any binding authority.[7]  Ultimately,

21

22           [7] Home Depot relies on a 1989 decision from the Eastern District of California which held
     that a truck driver who had struck overhead power lines with his truck ten or more times throughout
23   his career, and been reprimanded therefor twice previously, could not establish a prima facie case
     of age discrimination due to his patent failure to perform his job satisfactorily.  *See Phipps v. Gary
24   Drilling Co., Inc.*, 722 F. Supp. 615, 619-20 (E.D. Cal. 1989).  That case is not binding on this
     Court.  Further, it is factually dissimilar from this case, where no record evidence suggests that
25   plaintiffs had committed multiple serious infractions like the truck driver in *Phipps*.
             As for plaintiffs, they rely on two Sixth Circuit authorities for the proposition that the Court
26   must examine the matter of satisfactory performance independently from the conduct that
     purportedly gave rise to the termination.  *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651,
27   660-61 (6th Cir. 2000) (holding that district court erred in regarding employer's non-discriminatory
     reason for adverse employment action, proffered at step 2 of McDonnell Douglas analysis, as
28

United States District Court
Northern District of California

1   the Court need not resolve the question of which standard to apply.  Assuming arguendo that

2   plaintiffs do satisfy this prong of the prima facie test, they still do not survive summary judgment

3   because they do not present evidence establishing pretext.  (*See infra* Section IV.B.5.)

4   Accordingly, the Court assumes without deciding that plaintiffs establish this prong of the prima

5   facie case.

### b.   Fourth Prong: Circumstances Suggesting Discrimination

7           Plaintiffs' age, race, and national discrimination claims all require assertion of a prima facie

8   case, the fourth prong of which is some "other circumstance," additional to the three previous

9   prongs, that suggests discrimination.  Though case law specifies certain kinds of "other

10  circumstance" that can give rise to an inference of discrimination, no particular circumstance is

11  required.  *See Burdine*, 450 U.S. at 253 n.6 (noting that prima facie standard is flexible and

12  responsive to "differing factual situations").  One principle reliably derived from precedent is that

13  relatively favorable treatment of similarly situated individuals outside of plaintiffs' protected class

14  may be sufficiently suggestive of discrimination for purposes of establishing a prima facie case.

15  *See St. Mary's Honor Ctr.*, 509 U.S. at 506; *McGinest*, 360 F.3d at 1122; *Bodett*, 366 F.3d at 744.

16  "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."

17  *Vasquez*, 349 F.3d at 641.  When disciplinary action is involved, a "legitimate comparator" would

18  be another employee who allegedly engaged "in problematic conduct of comparable seriousness"

19  but was treated differently.  *Id.*; *Bodett*, 366 F.3d at 744; *Hawn v. Executive Jet Management, Inc.*,

20  615 F.3d 1151, 1156 (9th Cir. 2010); *see also Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116,

21  1125 (9th Cir. 2009) ("The employees need not be identical," but "they must be similar in all

22  *material* respects." (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (emphasis in

23  *Nicholson*)).

24  evidence of failure to perform job duties satisfactorily for purposes of step 1 of analysis, thereby
    conflating distinct steps); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002)
25  (same, citing *Cline*).  Neither party cites a Ninth Circuit or California case adopting this rule.  At
    least one Ninth Circuit decision applying California law appears not to follow it.  *Villiarimo v.*
26  *Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 n.8 (9th Cir. 2002) (in dicta, observing that it was "not
    clear" whether plaintiff had established satisfactory job performance because she admitted that her
27  employer "told her that she was fired because she did not perform her job satisfactorily" and she
    appeared to concede having made the mistake for which she was putatively fired).
28

17

Plaintiffs marshal different evidence and argument in support of, on the one hand, their race and national origin discrimination claims, and, on the other, their age discrimination claims. With respect to plaintiffs' race and national origin claims, plaintiffs seek to demonstrate favorable treatment of similarly situated persons outside plaintiffs' protected classes by pointing to Coite's failure to include Herger and Leung in his initial round of interviews. (Opp'n at 20-21.) Plaintiffs' theory is that Coite's preliminary inclination to terminate only plaintiffs and give final warnings only to quiz-takers Exconde and Di Francia, despite knowing that Leung and Herger also had been implicated as quiz-takers, suggests discriminatory intent. Plaintiffs assert that Home Depot later "changed its decision"—that is, decided to terminate Exconde, Di Francia, and Leung in addition to plaintiffs—only to cover up a discriminatory motive. (*Id.* (quoting Villanueva Decl., Ex. 23 (Fitzpatrick email)).)

Viewing the available evidence in the light most favorable to plaintiffs, and remaining mindful that the purpose of the first step of the *McDonnell Douglas* inquiry is only to weed out the most obviously unmeritorious cases, the Court determines that plaintiffs satisfy the fourth prong of their prima facie cases for race and national origin discrimination. Coite's failure to include Herger in his initial investigation, despite de Leon having directly implicated him, supports a bare inference of discrimination, in that Herger was similarly situated to other persons investigated and his exclusion from the investigation constitutes favorable treatment. The failure to include Leung also supports a determination that the fourth prong is satisfied because she, too, was not investigated and her mixed heritage, viewed in the light most favorable to plaintiffs, places her outside plaintiffs' protected categories. Accordingly, the Court finds that plaintiffs satisfy the fourth prong of the prima facie case for their race and national origin discrimination claims.

For the same reason, plaintiffs establish the fourth prong of the prima facie case for their age claim. Plaintiffs contend that their testimony establishes that "helping each other with the [InFocus] quiz is a [sic] normal and prevalent" and that defendant knew or should have known that it was "common and prevalent," but regardless "decided not [to] investigate, interview, discipline or terminate the similarly situated employees." (Opp'n at 21.) Record evidence supports that contention. De Leon testified that eighty percent of the employees at Home Depot were involved in

the quiz-taking conduct. (Villanueva Decl., Ex. 1 at 76:25-77:11.)[8] De Leon testified that "we"—apparently, plaintiffs—told Coite about the eighty percent, but that Coite said: "Don't worry about them. Just worry about yourself." (*Id.* at 77:9-11.) The record establishes that Coite did not then interview even all the persons implicated by name in plaintiffs' written statements. Rather, Coite interviewed the plaintiffs, Exconde, and Di Francia, but not Herger or Leung. Though Di Franica, like Herger and Leung, was in his twenties, Coite's failure to interview Herger and Leung while interviewing plaintiffs and Exconde, who was in her fifties, suffices to raise a bare suggestion of age discrimination.

For the foregoing reasons, plaintiffs satisfy the requirement of showing "other circumstances" suggesting race, national origin, and age discrimination.[9] This determination, in conjunction with the Court's assumption for the sake of argument that plaintiffs satisfy the requirement of adequate job performance, leads the Court to the second step of the *McDonnell Douglas* analysis.

**4.    Defendant's Burden**

At the second step of the *McDonnell Douglas* test, the burden shifts to Home Depot to articulate a legitimate, non-discriminatory reason for the adverse employment action. Here, Home Depot obviously does—the integrity violations to which all three plaintiffs admitted, violations which, the undisputed evidence shows, resulted in termination for all six employees who admitted to them, including Di Francia, a white person in his twenties, but did not result in termination for Herger, the one person whose participation was not admitted or otherwise corroborated.

---

[8] Contrary to plaintiffs' assertion that all three of them testified to the prevalence of the quiz-taking conduct, plaintiffs supply no testimony by Santiago, and the proffered two-page excerpt of Tomada's deposition transcript (Villanueva Decl., Ex. 2) does not discuss the issue.

[9] The Court need not reach plaintiffs' unsubstantiated argument that a white employee in his mid-twenties, Kyle Hanes, replaced both Santiago and Tomada's head cashier positions. (Opp'n at 4, 20.) The Court notes only that the record itself does not support plaintiffs' suggestion that Hanes directly replaced Santiago or Tomada, given the indirect (at best) link between Hanes's hiring and Santiago and Tomada's termination. (*See* Villanueva Decl., Ex. 31 at 110:24-112:25, 115:1-13; *id.*, Ex. 30 at 19:9-21:16, 28:18-29:8.) Further, plaintiffs are silent as to who, if anyone, replaced de Leon.

United States District Court
Northern District of California

Plaintiffs suggest that the violations to which they admitted were not truly serious, but what matters is whether Home Depot *thought* they were serious. *King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 433 (Cal. Ct. App. 2007) (citing *Villiarimo*, 281 F.3d at 1063). On this issue, plaintiffs suggest that Home Depot did not think of the violations as truly serious because they failed to conduct a sweeping investigation following Santiago's written statement that nameless "others" engaged in the quiz-taking conduct and plaintiffs' assertion to store manager Coite that eighty percent of Home Depot employees did so as well. Further, Plaintiffs fault Coite and AACG investigator McLeod for failing to ask "open-ended questions" to seek out every person who participated in the quiz-taking conduct. (Opp'n at 9.)[10] In a related vein, plaintiffs criticize the manner in which Home Depot asked plaintiffs questions, saying that they were predisposed to a finding of fault. (*E.g.*, Opp'n at 6 ("Coite prefaced Santiago's questions with to the effect, [sic] 'I need you to tell me the truth because there's a statement made already, did someone do your In Focus [sic] quiz? Have you done the In Focus quiz for others.'" (citing Dkt. No. 49 ¶ 4)).)

The evidence does not support plaintiffs' proffered inference, i.e., that Home Depot failed to take the violations seriously or investigate the violations adequately. The record shows that Home Depot involved numerous personnel at the district, regional, and corporate levels in making the termination decisions at issue, giving the plaintiffs and others' cases multiple reviews by multiple HR professionals. One of these professionals, Castillo, commented that the proposed discipline of terminating plaintiffs seemed "harsh for the infraction." (Villanueva Decl., Ex. 18, at HD001015-16.) This comment was followed by further investigation and deliberation. Senior manager Riggs reviewed the case and determined that McLeod's initial investigation—which mirrored Coite's own—had been inadequate.[11] Riggs then directed McLeod to correct her mistakes by interviewing

---

[10] In identifying the form of McLeod's questions, plaintiffs rely exclusively on McLeod's post hoc notes of her recollection of the conversation she had with Leung. (Dkt. No. 40, Fact 65 (citing Villanueva Decl., Ex. 11 ("McLeod Notes")).)

[11] The record reflects that McLeod's initial failure to interview Herger and Leung was an oversight on her part. (*See* Cartwright Decl., Ex. 31 at HD001002 (email string in which McLeod apologizes to Riggs for not having asked about Herger and Leung and admits that she hadn't been "paying attention").) Plaintiffs do not directly question McLeod's credibility, rather characterizing her as having been "tainted" by Coite and characterizing Home Depot—as opposed to McLeod,

United States District Court
Northern District of California

1    Leung and Herger, which McLeod did.  Riggs's ultimate recommendation to Coite, including the

2    recommendation of termination for Leung but not Herger, hinged on the results of McLeod's

3    interview with them.  The fact that Home Depot did not ask all the questions plaintiffs would wish,

4    ask them in plaintiffs' preferred format, or immediately ask them in a faultless investigation, does

5    not, without more, show that Home Depot's stated reason for terminating plaintiffs is insincere or

6    illegitimate.

7        Home Depot has met its burden of articulating a legitimate, nondiscriminatory reason for

8    terminating plaintiffs, namely, their violation of company policy in having others complete their

9    InFocus quizzes for them.

10                        **5.    Plaintiffs' Showing of Pretext**

11        To survive summary judgment, plaintiffs must produce substantial evidence showing that

12   Home Depot acted with discriminatory animus or that its proffered explanation is unworthy of

13   credence.  *Burdine,* 450 U.S. at 256; *Chuang v. University of Cal. Davis,* 225 F.3d 1115, 1127 (9th

14   Cir. 2000).  The inquiry is not whether Home Depot's actions were "wrong, mistaken, or unwise,"

15   but rather whether a rational fact finder could reasonably reject Home Depot's explanations as false

16   or pretextual.  *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (Cal. Ct. App. 2000);

17   *see also Guz*, 24 Cal. 4th at 362 (plaintiff cannot survive summary judgment unless record evidence

18   places defendant's "creditable and sufficient showing of innocent motive in material dispute by

19   raising a triable issue, i.e., a permissible inference, that, in fact, [defendant] acted for discriminatory

20   purposes").  That is, plaintiffs are "required to demonstrate such weaknesses, implausibilities,

21   inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons for the action

22   that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that

23   the employer did not act for the asserted non-discriminatory reasons." *Reeves v. MV Transp., Inc.*,

24   186 Cal. App. 4th 666, 674 (Cal. Ct. App. 2010) (internal quotation marks, brackets, and citations

25   omitted).  Any circumstantial evidence of such pretext must be "specific and substantial." *King*,

26   152 Cal. App. 4th at 433 (citations omitted).  Plaintiffs' "subjective beliefs in an employment

27

28   specifically—as having engaged in a cover-up of its true motives for firing plaintiffs.  In light of
     McLeod's uncontroverted explanation for her initial failure to interview Herger and Leung, nothing
     nefarious is reasonably read into her delay.

United States District Court
Northern District of California

1   discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving

2   declarations." *Id.*

3          Plaintiffs make five arguments regarding pretext.  The Court concludes that, whether

4   considered separately or cumulatively, none suffice to raise a triable issue of material fact.

5                  a.      *Argument 1: "Failure to Interview Witnesses"*

6          Plaintiffs argue that Coite's failure to include Leung and Herger in his initial round of

7   interviews demonstrates pretext.  (Opp'n at 21.)  Plaintiffs rely on *Nazir v. United Airlines, Inc.*,

8   178 Cal. App. 4th 243, 280 (2009), for the proposition that "[a]n employer's failure to interview

9   witnesses for potentially exculpatory information evidences pretext."  Though that is a valid point

10  of law, it does not assist plaintiffs here.  Home Depot ultimately *did* interview Herger and Leung,

11  albeit belatedly.  At most, Coite and McLeod failed to interview those persons prior to direction

12  from Riggs to do so.  Plaintiffs focus on Coite and suggest a cat's paw theory. [12]  Leaving aside

13  plaintiffs' failure, acknowledged at oral argument, to amend the complaint to assert the cat's paw

14  _____

15  [12] The name of the cat's paw theory "is based on an old fable in which a scheming monkey
    convinces an unwitting cat to fetch roasting chestnuts from a fire.  The cat burns its paw and the

16  monkey gets the chestnuts."  1 *Manual on Employment Discrimination* § 1:28.50 (citations
    omitted).  "In employment discrimination cases, the 'cat's paw' is the unwitting manager or

17  supervisor who is persuaded to act based on another's illegal bias."  *Id.*  "An example would be
    where an immediate supervisor is biased and influences the upper level manager, who has firing

18  authority, who pro forma approves the recommendation for termination."  *Id.*  The Ninth Circuit

19  has articulated the cat's paw theory thusly:

20          We hold that if a subordinate, in response to a plaintiff's protected activity,
            sets in motion a proceeding by an independent decisionmaker that leads to an

21          adverse employment action, the subordinate's bias is imputed to the
            employer if the plaintiff can prove that the allegedly independent adverse

22          employment decision was not actually independent because the biased
            subordinate influenced or was involved in the decision or decisionmaking

23          process.

24

25  *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).

26          In this case, plaintiffs' invocation of the cat's paw theory is inchoate and unnecessary.
    Plaintiffs acknowledge that Coite held final decisionmaking authority regarding plaintiffs

27  terminations and, in plaintiffs' telling, it is from Coite that the discriminatory animus emanated.  It
    is not clear how Coite could have improperly influenced *himself*, as contemplated by a cat's paw

28  formulation.

United States District Court
Northern District of California

1   theory or otherwise notify Home Depot in writing of their intention to do so, Coite and, later,

2   McLeod's failure to interview Herger and Leung does not raise an inference that Home Depot acted

3   toward plaintiffs with discriminatory animus, because Home Depot eventually did interview Herger

4   and Leung.  Further, Home Depot eventually terminated Leung, along with Di Francia.  Plaintiffs

5   argue that Leung's termination served merely to cover up Home Depot's true discriminatory motive,

6   but no evidence supports that speculation.  Indeed, it bears emphasis that the record here is notably

7   devoid of admissible evidence of conduct suggestive of discrimination.  Plaintiffs worked at the

8   Colma Pro Home Depot store for a combined 32 years, yet proffer no evidence of discrimination

9   beyond the events surrounding their termination following the discovery of their conduct regarding

10  the InFocus quizzes.[13]  The totality of circumstances in this case, as reflected by the admissible

11  evidence, renders unreasonable any inference that the imperfections of Coite's initial investigation

12  were motivated by discriminatory animus.  To survive summary judgment, plaintiffs must marshal

13  admissible evidence sufficient for a jury to return a verdict for them.  *Anderson*, 477 U.S. at 249-

14  50, 252.  Merely colorable evidence, like that tendered here, does not suffice.  *Id.*

15              b.    *Argument 2: "Disciplinary Process Predisposed to Confirm All*
                      *Charges"*
16

17         Plaintiffs argue that the disciplinary process undertaken by Home Depot was predisposed to

18  confirm all charges.  (Opp'n at 22-23.)  Plaintiffs rely solely on *Reeves v. Safeway Stores, Inc.*, 121

19  Cal. App. 4th 95 (Cal. Ct. App. 2004) ("*Safeway*").  In *Safeway*, the California Court of Appeal

20  found that a plaintiff in an employment discrimination case had raised a triable issue of material

21  fact by adducing evidence sufficient to "support[] an inference that [an investigator's] investigation

22  of the alleged misconduct [of workplace violence] was not truly independent, but was heavily

23  skewed to favor the ostensibly tentative conclusions of the reporting supervisor . . . ."  *Id.* at 119.

24  The Court of Appeal made that determination largely on the basis of the investigator's phrasing: for

25

26         _____

          [13] This is not to say that the record is devoid of evidence of Coite's treatment of plaintiffs.
27  Santiago testified that Coite declined to terminate her, despite being able to, after she used a
    derogatory slur at work.  (Cartwright Decl., Ex. 6, at 193:1-23.)  Santiago admitted that she had
28  never heard Coite make comments derogatory of age, race, or national origin.  (*Id.* at 132:21-23.)
    Tomada admitted the same.  (*Id.*, Ex. 11, at 106:3-12.)

United States District Court
Northern District of California

instance, he referred to having a "solid case" against employees, as opposed to a "more neutral construction," to a complainant as the "victim" rather than the "accuser," and to the subject of the complaint as a "suspect" rather than the "accused." *Id.* at 119-20.  The Court of Appeal also identified other language used by the investigator that could lead a factfinder to infer that the investigator "saw his function not as gathering objective evidence to pass to [the person with firing authority] but as lending credence to [the] report that 'workplace violence' had occurred." *Id.* at 121.  The Court of Appeal also noted that the investigator made the case against the accused appear "solid" primarily by papering over exculpating facts, and that, while the investigator expended substantial efforts probing the accused's story, he appeared to accept the accuser's story uncritically. *See id.* at 120-21.  The Court found that the evidence before it supported "an inference that [the investigator] acted as a sort of institutionalized cat's paw to effectuate the retaliatory intentions of supervisors by substantiating their claims of misconduct and presenting the claims, thus reinforced, to upper management." *Id.* at 119 (internal quotation marks omitted).

In arguing that *Safeway* controls in this case (*see* Opp'n at 22-23), plaintiffs point to conduct by McLeod.  First, they note the similarity between her initial recommendation of termination for plaintiffs and final warnings for Di Francia and Exconde, made, as was Coite's initial determination, without interviewing all the personnel involved, i.e., Herger and Leung.  They also point to: McLeod's characterization of the conduct at issue as an "In Focus Cheating Ring" (*id.* at 23 (quoting Villanueva Decl., Ex. 10)); her emailed message to Coite that she was "required to interview to give termination and final recommendations," which followed Coite's indicating to her that he was considering terminating plaintiffs and giving final warnings to Exconde and Di Francia, (*id.* (apparently quoting Villanueva Decl., Ex. 23 at HD000934)); and her questions which, plaintiffs suggest, were framed to "specifically target" them (*id.* (apparently quoting Villanueva Decl., Ex. 7 at HD000884 (McLeod's post hoc notes of questions asked to Santiago during phone interview))).

*Safeway* does not control here, for three reasons.  First, the quantum of evidence proffered by plaintiffs here is not as substantial as the evidence in *Safeway*.  The *Safeway* plaintiff could point to numerous ways in which the investigation appeared biased.  Here, however, plaintiffs cite only

United States District Court
Northern District of California

stray phrases and words used by McLeod, none of which, in the context of this case, sufficiently suggest bias.  Second, neither of the AACG investigators, McLeod and Riggs, knew of plaintiffs' age, race, or national origin during their investigation.  Plaintiffs admit that McLeod lacked such knowledge.  (Dkt. No. 40 at 5-6, Fact 19.)  As to Riggs, plaintiffs claim that she learned at least their ages during her involvement in the investigation, but no evidence supports that assertion.  (*See id.* at 4, Fact 12.)  Without knowledge of plaintiffs' ages, race, or national origin, it is unclear how McLeod or Riggs could have acted out of any discriminatory animus.[14]  Finally, plaintiffs establish no nexus between McLeod's purported bias and the ultimate decision to terminate plaintiffs.  The evidence unequivocally shows that McLeod's responsibilities were limited to making recommendations, and that Coite had the final authority to terminate.  (Villanueva Decl., Ex. 3 at 11:9-20 (McLeod's testimony that she had authority only to recommend discipline); *id.*, Ex. 16 (Riggs email to Coite: "Yes, termination is the recommendation.  However, the final decision is yours.").)  Further, Riggs later directed McLeod to make a more searching investigation.  (*Id.*, Ex. 11.)  In light of these facts, plaintiffs' theory becomes strained at best: to hear plaintiffs tell it, Coite tainted McLeod with his bias, leading McLeod to conduct a biased investigation, which resulted in her recommendation to fire plaintiffs but only give final warnings to Di Francia and Leung, which recommendation Riggs then modified after receiving Fitzpatrick's email about "serious noise," causing McLeod to conduct further biased investigation, the results of which she passed to Riggs, who then recommended termination to Coite, the ultimate decision maker.  These circumstances are not the sort of "specific and substantial" evidence that raise a triable issue of material fact.  No reasonable fact finder, hearing this story, could conclude that it suggests biased investigation, as opposed to merely imperfect investigation, particularly in the absence of any evidence that Riggs or McLeod knew of plaintiffs' protected characteristics.

---

[14] At oral argument, plaintiffs' counsel claimed that plaintiffs' surnames would have alerted AACG investigators that plaintiffs were Filipino.  That claim is compounded of mere speculation.  First, plaintiffs' surnames (Tomada, Santiago, and de Leon) are not unambiguously Filipino, and could just as well indicate Latin American descent.  That ambiguity, at minimum, complicates plaintiffs' race and national origin claims, which they assert on the basis of their Asian and Filipino heritage.  Second, not all persons bearing Spanish-derived surnames are Filipino or even, for that matter, Latino.  Indeed, AACG investigator Castillo testified that she herself is "Caucasian."  (Villanueva Decl., Ex. 17, at 6:19-20.)

*c.*     *Argument 3: "Employer's Inconsistent Explanations"*

Plaintiffs argue that Home Depot has given inconsistent explanations for its actions and that these purported inconsistencies demonstrate pretext.  (Opp'n at 23-24.)  "In an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions."  *Guz*, 24 Cal. 4th at 363; *see also E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (where over a span of months an employer changed its story in direct response to adverse findings uncovered by a state investigation, "a reasonable juror could infer that the explanations given by [the employer] at trial were pretextual").

Here, the record does not establish that Home Depot changed its reasons for imposing discipline on plaintiffs.  Rather, the evidence shows that the reason given has always been that plaintiffs committed a "major" violation of the company's Code of Conduct.  Under Home Depot's Code of Conduct, a "Major Work Rule Violation is prohibited conduct that will normally result in termination of employment for a first offense. Managers should always consider whether an offense is of such a serious nature that termination for a first offense is appropriate . . . ."  (Code of Conduct at HD000360; *see also id.* at HD000365 ("Major Work Rule Violations are so serious in nautre as to normally warrant termination for a first offense.").)  The Code of Conduct includes a five-and-a-half page, single-spaced, bulleted list of Major Work Rule Violations.  (*Id.* at HD000360-65.)[15] These violations are divided by kind, among which is a heading for violations involving "Failure to Act with Integrity and Honesty; Conflict of Interest," which the parties denominate "integrity violations."  (*Id.* at HD000362.)  Among these integrity violations are "[f]alsifying a Company document or a document relied upon by the Company by including false information or by knowingly omitting relevant information" and "[a]ltering, falsifying destroying, or misusing any employment documentation."  (*Id.* at HD000363.)  Riggs testified that, in forming her

---

[15] The Major Work Rule Violations stand in contrast to Minor Work Rule Violations, for which Home Depot employs a system of progressive discipline.  (Code of Conduct at HD000368; *see also* Villanueva Decl., Ex. 13, at 41:6-24 (Riggs testimony regarding existence of and four-step structure of progressive discipline policy); Ex. 20, at 22:8-16 (Fitzpatrick testimony at to same); Ex. 24, at 17:22-18:8 (Coite testimony as to same).)  The Code of Conduct sets forth two pages of Minor Work Rule Violations.

United States District Court
Northern District of California

1   recommendation to terminate all the involved associates, including plaintiffs, she determined that

2   the employees who admitted to taking an InFocus quiz for another, or allowing their InFocus quiz

3   to be taken for them, had committed two integrity violations.  (Cartwright Decl., Ex. 30, at 109:3-

4   114:22; Dkt. No. 36-5, ¶¶ 8-13.)

5          Plaintiffs' claim of inconsistent explanation rests on three bases (Opp'n at 14-16), all of

6   which are unavailing.  The first rests largely on a strained, implausible reading of the

7   Performance/Discipline Notices given to each terminated employee.  (*See* Dkt. No. 36-7 at 31, 70,

8   and 103 of 108 (termination notices for plaintiffs).)  Each set forth three *examples* of violations of

9   the company's integrity policy.  (*Id.* ("The following are examples.")  Plaintiffs treat the example

10  violations as if they were the violations with which plaintiffs actually were charged.  (Opp'n at 14,

11  23-24.)  No fair reading of the Performance/Discipline Notices could support plaintiffs'

12  characterization of abstract examples of policy violations as the actual bases for termination.

13         The second purported basis dovetails with the first: plaintiffs point to the acknowledgement

14  by Coite and Riggs during their depositions that one of the example reasons for termination

15  contained in the Performance/Discipline Notices (giving another associate one's login ID) did not,

16  in fact, apply to plaintiffs.  (Opp'n at 14-15; *see also* Villanueva Decl., Ex. 24 (Coite deposition), at

17  92:4-7; *id.*, Ex. 13, at 104:14-106:2, 114:20-22 (Riggs deposition).)  The applicability, or not, of

18  that reason is not a material fact in this case, because the purported "reasons" were merely

19  examples of types of integrity violations, not Home Depot's articulation of its true reasons.

20         The third purported basis is that Riggs gave inconsistent testimony at her deposition.

21  (Opp'n at 15.)  Plaintiffs contend that, during her deposition, Riggs changed her characterization of

22  the reasons why plaintiffs were terminated in order to ensure that they were found in violation of

23  two major work violations.  (*Id.*, *id.* at 23-24.)  The import of two major work violations, according

24  to plaintiffs, is that Riggs had testified that "typically, two major work rule violations result in

25  termination of employment."  (Villanueva Decl., Ex. 13, at 104:5-7.)  Reviewing the alleged

26  inconsistency, it is apparent that the statement does not rise to the level of demonstrating that the

27  Home Depot's stated reasons for terminating plaintiffs are unworthy of credence, let alone of

28  proving intentional discrimination.  "The ultimate question is whether the employer intentionally

United States District Court
Northern District of California

discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct." *Reeves*, 530 U.S. at 146-47 (internal quotation marks and ellipsis omitted).  That is, disbelief of the employer does not relieve plaintiffs of their burden of demonstrating intentional discrimination.  *Id.* It is true that, in a proper case, an "inference of dissembling" sufficient to create a triable issue of material fact "may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions."  *Guz*, 24 Cal. 4th at 363.  However, this is not such a case.  Riggs's deposition statements, though inartful, do not cast serious doubt on Home Depot's stated reason for terminating plaintiffs, particularly when, here as in *Guz*, plaintiffs have "made substantial *concessions* to the truth of [Home Depot's] proffered nondiscriminatory reasons."  *Id.* (emphasis in original).  Plaintiffs admitted to conduct amounting to at least one integrity violation, as they tacitly acknowledge.  (Opp'n at 24 (in arguing that Home Depot's justifications have shifted, acknowledging that Home Depot "is left with one violation").)  Whether plaintiffs committed one or two integrity violations is not, in the context of this case, a material question.  At most, plaintiffs demonstrate some confusion by Home Depot over whether plaintiffs' admitted conduct constituted two or merely one Major Work Rule Violations under the Code of Conduct.  That alone is not actionable.  To avoid summary judgment, a plaintiff "can not simply show the employer's decision was wrong, mistaken, or unwise."  *Morgan*, 88 Cal. App. 4th at 75 (internal quotation marks, citations, and other alterations omitted).  "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.*  Plaintiffs' attack on Home Depot's purportedly "shifting" justifications falls short of that standard.

        *d.*      *Argument 4: "Comparative Evidence (Similarly Situated Employees Treated More Favorably)"*

Plaintiffs argue that they have adduced comparator evidence that similarly situated employees were treated more favorably.  (Opp'n at 24.)  Such evidence can establish pretext.  *See*,

United States District Court
Northern District of California

*e.g.*, *McDonnell Douglas*, 411 U.S. at 804; *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  Plaintiffs have not, however, adduced such evidence.  Plaintiffs aver that if Home Depot had conducted a more probing inquiry into who else was engaging in the quiz-taking conduct, plaintiffs would have identified many of their co-workers, as they did in their depositions: "for example[,] Jamicia Henry (24-25, half black), and Bianca Henry (20's, half black), Raymond Chao (mid-20's, Asian/Chinese), Tiffany Adler (mid-20's, White), Aida (mid-50's, Spanish)."  (Opp'n at 24 (citing Villanueva Decl., Ex. 1 at 77:12-18, 78:5-9, 79:6-20).)  However, these persons were not similarly situated to plaintiffs at the time of Home Depot's investigation because they were not implicated by plaintiffs or others.  Further, of the two implicated persons who are entirely outside plaintiffs' protected classes, Di Francia and Herger, the former admitted to participating in the prohibited conduct and was terminated while the latter denied it and was not.  Nothing about that is incoherent, unconvincing, or otherwise suggestive of pretext.  *MV Transp.*, 186 Cal. App. 4th at 674.

> e.     *Argument 5: "Plaintiffs Have Established Direct Evidence of Pretext"*

Plaintiffs' final argument is that they have presented direct evidence of pretext in that Home Depot supposedly changed positions regarding the decision to terminate plaintiffs after Fitzpatrick, the division's human resources liaison, warned that terminating three long-term employees could result in some "serious noise."  (Opp'n at 24-25.)  As previously discussed in Section IV.B.2, that evidence is circumstantial, not direct.  Accordingly, plaintiffs' argument from direct evidence fails.

## 6.     Conclusion as to Discrimination Claims

Assuming that plaintiffs can satisfy all the elements of prima facie cases for race, national origin, and age discrimination, Home Depot has articulated a legitimate, non-discriminatory reason for terminating plaintiffs: their admitted violation of Home Depot's Code of Conduct.  Plaintiffs have not adduced direct or circumstantial evidence of pretext sufficient to raise a triable issue of material fact.  All employees who admitted to violating the Code of Conduct, either by taking quizzes for others or asking others to take their quizzes for them, were terminated.  Home Depot justifies its decision for declining to discipline the one implicated person who denied the prohibited conduct, Herger, on the basis that his violation of the Code of Conduct was not corroborated.  That

1    explanation is consistent with its justification for terminating plaintiffs, as well as Di Francia,

2    Exconde, and Leung.

3        Accordingly, the Court **GRANTS** Home Depot's motion for summary judgment as to

4    plaintiffs' claims of race, national origin, and age discrimination under FEHA.  Further, since

5    plaintiffs' claims for wrongful termination in violation of public policy are premised on underlying

6    violations of FEHA, the Court **GRANTS** Home Depot's motion as to those claims as well.

7        **C.      Plaintiffs' Breach of Contract Claims**

8        Plaintiffs bring two common-law contract-based claims.  Specifically, plaintiffs bring a

9    claim for breach of their employment contracts, which plaintiffs allege were implied-in-fact

10   contracts imposing a for-cause termination requirement—not, as Home Depot avers, at-will

11   contracts.  Plaintiffs also assert a claim for breach of the covenant of good faith and fair dealing.

12   Home Depot moves for summary judgment as to both claims, arguing that (1) the contracts were at-

13   will and, (2) even if a for-cause contract existed, Home Depot had cause for terminating plaintiffs,

14   and (3) as to the claim for breach of the covenant of good faith and fair dealing, no breach of the

15   covenant occurred because no breach of the contract occurred.  (Mot. at 20, 23.)

16       The Court need not resolve all these issues because, even assuming that all three plaintiffs

17   had an implied-in-fact for-cause contract with Home Depot, the evidence establishes that good

18   cause was present here.  Because Home Depot had good cause to terminate the plaintiffs, their

19   breach of contract claim fails.  And because their breach of contract claim fails, so does their claim

20   for breach of the covenant of good faith and fair dealing.

21       "Good cause, in the context of implied employment contracts, means 'fair and honest

22   reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or

23   capricious, unrelated to business needs or goals, or pretextual.'"  *King*, 152 Cal. App. 4th at 438

24   (quoting *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93, 108 (1998)).  Under this standard,

25   the "question critical to [an employer's] liability is not whether plaintiff in fact violated [the

26   employer's] integrity policy . . . , but whether [the employer], acting in good faith following an

27   appropriate investigation, had reasonable grounds for believing plaintiff had done so."  *Id.*  Here,

28   the evidence shows that Home Depot's reasons for terminating plaintiffs were, as discussed above,

United States District Court
Northern District of California

30

not pretextual.  Further, nothing suggests they were trivial or arbitrary; on the contrary, Home Depot appears to take integrity violations seriously, and its InFocus quizzes, which contain information about safety and customer service, are rationally related to legitimate business ends. Further, Home Depot gave the plaintiffs the benefit of a reasonable investigation, during which plaintiffs admitted to the conduct charged.  Home Depot had more than credible grounds for believing that plaintiffs violated the Code of Conduct; it had plaintiffs' admissions that they had. Accordingly, the Court **GRANTS** Home Depot's motion for summary judgment as to plaintiffs' breach of contract claim.

The Court also **GRANTS** Home Depot's motion as to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  "The implied covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (Cal. Ct. App. 2004) (citation omitted).  It "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Guz*, 24 Cal. 4th at 349 (citations and internal quotation marks omitted; emphasis in original).  "It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* at 350. It requires only that, when a contract provides a party with discretion, that that discretion be exercised in good faith and in accordance with fair dealing. *Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp.*, 221 Cal. App. 4th 867, 882 (Cal. Ct. App. 2013), *as modified on denial of reh'g* (Dec. 24, 2013), *review denied* (Mar. 12, 2014); *Peak-Las Positas Partners v. Bollag*, 172 Cal. App. 4th 101, 106 (Cal. Ct. App. 2009).

Here, for plaintiffs' implied-covenant claim to survive summary judgment, plaintiffs would have to make a showing that the claim extended beyond their contract claim.  This they have not done.  The elements of an implied-covenant claim include the plaintiff doing "all, or substantially all of the significant things that the contract required [her] to do," unless she was excused from doing them.  Judicial Council of California, CIVIL JURY INSTRUCTIONS, Instruction 325.  As discussed above, however, Home Depot had good cause for terminating plaintiffs—that is,

31

plaintiffs did not do all the things required of them.  Nor is there any showing that Home Depot

"unfairly interfered" with their ability to receive the benefits of their employment contract.  *Id.*

Rather, the record establishes that Home Depot provided a reasonable investigation into the

circumstances surrounding plaintiffs' admitted violations of the Code of Conduct.  Plaintiffs'

subjective impressions of unfairness are not enough to raise a triable issue of material fact as to this

claim.

        The Court **GRANTS** Home Depot's motion for summary judgment as to both of plaintiffs'

contract-based claims.  Further, the Court **DENIES AS MOOT** Home Depot's motion for summary

judgment as to plaintiffs' prayer for punitive damages, since no underlying claim survives on which

punitive damages could be awarded.

**V.     CONCLUSION**

        For the foregoing reasons, the Court **GRANTS** the motion for summary judgment of

defendant Home Depot U.S.A., Inc. as to all claims.  A final Judgment in favor of defendant and

against plaintiffs shall issue separately.

        **IT IS SO ORDERED**.

Date: June 3, 2014

                                      **YVONNE GONZALEZ ROGERS**
                                      **UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

32